[PHILADELPHIA, APRIL 29th, 1837.]

## BALL and Others *against* SLACK and Others.

1. A grant was made by the Proprietary officers in 1690, of three pieces of land on the the river Delaware, one of which was described as follows : " The first piece or parcel beginneth at the mouth of Gunner's Creek, from thence running up the several courses of Delaware river to a corner post of P. N.'s land, thence N. 16° W. by the said N.'s land 110 perches to a corner white oak standing near unto the above said Gunner's Creek, from thence following down the several water courses thereof to the place of beginning ; being 54 acres of land, swamp and cripple." The plaintiff claimed under this grant. The defendant held under a deed for a lot adjoining the plaintiff's lot on the south, which was conveyed to him after the date of the plaintiff's warrant, under the following description : " A certain lot or piece of land situate in the township, &c. containing in breadth on Queen street 70 feet and extending in depth from said street down to low water-mark of the Delaware river :" The course of Gunner's Creek is such that the point at which it discharges its water into the Delaware, at low water mark, is south of the northern line of the defendant if his lot be continued between parallel lines to low-water mark : *Held*, (1st) that the plaintiff's title began at low-water mark of the river and at the mouth of the creek at low-water mark; so that it was not lawful for the defendant to build a wharf on the northern bank of the creek : (2d.) That the rule would be the same though the mouth had been removed more to the south or north than it originally was; if the change had been gradual and had arisen from natural causes : otherwise if produced by the act of either party.

2. *It seems,* that the owners of land on the rivers Delaware and Schuylkill have a right to the land between high and low water mark between their boundary lines, subject to the right of the public to pass over it in vessels, when covered with water.

AN action of trespass *quare clausum fregerunt* was brought in this court, to July term 1829, by William White Ball and others against Daniel Slack, John Morrison and John Sansom.

(Ball *v.* Slack.)

On the trial which took place at a Court of *Nisi Prius,* held at Philadelphia on the 21st of November 1832, it appeared that the plaintiffs were the children and heirs at law of one Joseph Ball, by whom the title to the land in question was claimed under the following documents, which were given in evidence, viz.:

A certificate signed by the deputy surveyor general of the province, and certified to be a true copy from the original remaining in the Surveyor General's Office at Philadelphia, on the 31st of January 1764, as follows:

"Pennsylvania.—By virtue of a warrant from the commissioners, dated the 24th of ye eleventh mo. 1690, directed to the surveyor general, I do by authority from him, certify into the Secretary's Office that there was surveyed and laid out the same day unto Gunner Rambo, old renter, three several tracts or parcels of land, in the township of Shakamaxunk, and county of Philadelphia. The first piece or parcel beginneth at ye mouth of Gunner's Creek, from thence running up the several courses of Delaware river to a corner post of Peter Nelson's land, thence N. 16° W. by the said Nelson's land, 110 perches to a corner white oak standing near unto the above said Gunner's Creek, from thence following down the several water courses thereof to ye place of beginning; being fifty-four acres of land, swamp and cripple. The second piece or parcel beginneth at a corner post of John Tonk's land, standing by the side of a meadow, thence following up the several courses of the said meadow 105 perches to a corner of Peter Nelson's land; thence N. N. W. by the said Nelson's land 177 perches, to a corner tree, standing by the side of a swamp or cripple; thence by the several courses thereof, to a corner tree of Robert Turner's land; thence S. 36° Westwardly by the said Turner's land, 58 perches to a corner post of the aforesaid John Tonk's land; thence S. S. E. by the same 140 perches to the place of beginning, being 103 acres of land. The third piece or parcel (being swamp, meadow and cripple) beginneth at a corner post of Peter and Mickell Nelson's meadow and cripple, thence S. S. E. by ye same, 104 perches to a corner post standing by the river Delaware, thence up the same 41 perches, thence N. N. W. by a line of trees 97 perches, to a corner post standing on the fastland of Peter Nelson's, thence along the several courses of the said fast-land to ye place of beginning, being 26 acres; containing in all the three aforesaid tracts or parcels, 183 acres; which is accordingly entered and recorded in the Surveyor General's Office at Philadelphia."

Endorsed.—" Return for Gunner Rambo's 183 acres of land in Philadelphia county. Pat't dated 24 Feb. 1691-2. Old rent. Gunner Rambo, &c. forever—after leaving a cart way through his said land yt may be most convenient for Rob' Turner, his heirs and assigns to pass and repass from and to ye said Rob' Turner's plan-

(Ball *v.* Slack.)

tation adjacent to his the said Rob' Turner's meadow which he at present hath or for the future may have right unto—No. 2103.

WILLIAM BRIGDALE, R. S."

An indenture of lease and release, dated the 21st of March 1728, between Anthony Palmer of Shackamaxun in the county of Philadelphia, Gent., and Thomasine his wife, of the one part, and William Ball of the city of Philadelphia, merchant, of the other part, in which after reciting that, " whereas, in and by a certain indenture bearing date the 20th of June 1697, between Gunner Rambo of Shackamaxun aforesaid, old renter, of the one part, and Major George Lillington, Esq. of the island of Barbadoes, planter, of the other part, the said Gunner Rambo for the consideration therein mentioned, did grant, bargain, sell and confirm, unto the said Major George Lillington, all the said Gunner Rambo his three several tracts or parcels of land, swamp and cripples, in Shackamaxun in the county of Philadelphia, by the metes and bounds thereof respectively in the same indenture specified, containing in the whole 183 acres with the appurtenances, and all the estate, right, title, interest, claim and demand, which he, the said Gunner Rambo, had to those 8 acres of land, which he the said Gunner, gave unto Jacob Young, then deceased, and which was then occupied by John Tonk, who married the said Young's pretended widow, to hold to him the said Major George Lillington, his heirs and assigns forever ;" and also after reciting divers other mesne conveyances, the said Anthony Palmer and Thomasine, his wife, in consideration of the sum of £2400, lawful money of Pennsylvania, to them in hand paid by William Ball, did grant, bargain, sell, alien, enfeoff, release and confirm, unto the said William Ball, his heirs and assigns, " all and singular, the said recited tract or parcel of land, meadow, swamp and cripple, which lying contiguous in one entire tract in Shackamaxun aforesaid, is bounded and limited by the metes and bounds thereof thereinafter specified, and then agreed to be called and always in time to come, known by the name of Hope Farm : beginning at the mouth of Gunner's Creek, and running up the said creek on the several courses thereof 291 perches to a line of Robert Rawle's land, then by the said line S. S. E. 4 perches to a corner post, then by another line of the said Rawle's land N. 60° E. 178 perches and a half to a white oak ; then N. 31° E. 14 perches and a half, by another line of the said Rawle's land to a Spanish oak ; then by the land of Daniel Worthington on the same course 70 perches to a white oak ; then by a certain swamp or cripple belonging to the said Daniel Worthington and the said Robert Rawle, N. 65° E. 24 perches to a gum tree ; N. 85° E. 12 perches to a maple ; S. 74° E. 12 perches to a small saplin ; N. 81° E. 7 perches and a half to a small white oak ; N. 85° E. 25 perches to a black oak ; N. 80° E. 18 perches to a white oak ; N. 63° E. 15

(Ball v. Slack.)

perches to a post; N. 52° E. 14 perches to a white oak; N. 49° E. 33 perches to a swamp oak; N. 56° E; 14 perches to a maple; N. 65° E. 19 perches to a white oak; N. 72° E. 12 perches to a white oak; N. 60° E. 35 perches to the line of John Oxley's land; then S. S. E. by the same one 196 perches to a meadow belonging to Robert Rawle aforesaid; thence by the same and the meadow, late of Joseph Pidgeon, W. by S. 40 perches; then W. 62 perches to a gum; then S. 31° E. 26 perches to an ash-tree by a small creek; then down the same on the several courses thereof 247 perches to the river Delaware; then down the said river 572 perches to the place of beginning: containing by computation 676 acres besides the flats thereto belonging: together with the messuage or tenement on the same described great tract, called Hope Farm, aforesaid, erected and being, and together with all and singular the out-houses, barns, stables, buildings, gardens, orchards, meadows, marshes, swamps, cripples, flats, woods, underwood, timber, and trees, ways, waters, water-courses, fishings, fowlings, hawkings, huntings, rights, liberties, profits, privileges, emoluments, advantages, hereditaments and appurtenances whatsoever unto the said last described tract of land (then called and intended to be thereafter known by the name of Hope Farm) belonging, or in any wise appertaining, and the reversions and remainders of the same thereby granted premises, and the rents and profits thereof, and all the estate, right, title, interest, use, possession, property, claim and demand whatsoever of him the said Anthony Palmer and Thomasine, his wife, of, in and to all and singular the premises, and all patents, deeds, writings and evidences concerning the same."

The will of Wm. Ball, dated the 24th of May, 1737, and proved the 11th of November, 1740. The record of certain proceedings in partition in the year 1755, between William Ball and others, devisees of William Ball, by virtue of which a certain allotment was made to William Ball; and the sheriff's deed for the allotment which described it as being exclusive of a certain " three perch lane and landing, and a 60 foot lane and landing as represented in the said plan, which are set open for the common use of all the parties in the said writ named." The allotment to each of the other parties had this clause, " exclusive of the said lanes and landings set open as aforesaid."

The plaintiffs claimed under this William Ball.

The following parol evidence was also given on the part of the plaintiffs.

John Hewson, affirmed. " I was half-brother of Mrs. Ball. My father died in October, 1821, 13th or 14th. He was named one of the executors of Wm. Ball. Joseph Ball is deceased. My father moved on to the property in the spring of the year 1774, on the other side of Gunner's creek, now occupied by Dr. Dyott. I am

(Ball *v.* Slack.)

about 62 or 63 years old. Don't recollect distinctly before the year 1776. My father occupied the dwelling-house now occupied by Dr. Dyott, and all the ground on which the buildings are erected, excepting the lower part of it, which I think is occupied by 3 or 4 buildings now. There was a road formerly went dowh from the Point-road to the dwelling house, and then went up along shore and separated the two properties I am speaking of. I mean the lower part and that which my father occupied. The upper part was occupied by my father. This road was shut up by mutual consent, to hinder people from going over my father's premises. My father rented the lower property from Mr. Ball, before the change of the road, in 1792 or 3. I think Mr. Ball occupied the mansion house during summer. It stood in the neighbourhood of the present mansion house. The first recollection that I have, the lower part was occupied by a Mr. Clark, a dyer from Scotland. I can speak distinctly from 1776. My recollection is clear to that time, some indistinct to 1775. My father resided in the dwelling-house, now occupied by Mr. Dyott's people as a dwelling-house. Dr. Dyott's brother did live in it.. My father carried on there what was formerly denominated the calico printing business. One of the buildings is used as a glass house; one as a place to make crucibles or pots for the glass; the third as a clay-house; the fourth as a batch-house. My father at first occupied about an acre and a half, I presume. The lot occupied by Mr. Clark, exclusive of the flats, was about three quarters of an acre. I don't know whether Clark had the flats in his possession or not. Clark was not there above a year. After the British left the city, it was let to a person *that used* to catch eels. He occupied it some years. He occupied the little stone building and the lot. The point between Gunner's creek and the river Delaware was always under the administration of old William Ball. After my father came into the possession of the lower part, he put on a dye or copper-house, in which the little building formerly put up was taken in. The dye house built for Clark, now the batch-house. My father always kept every body off from the flats; never suffered any body to take a spit of mud off from the flat, from the eastern side of Gunner's creek, up to the line of the property which he rented. He never prevented any body, nobody offered to do it, while Mr. Wm. Ball lived. Mr. Wm. Ball gave me and my father leave to take mud. In the year 1807, and I think 8, we surrounded the whole property with a log-wharf, from the next property to Dr. Dyott's, now Rowland's, all round to the Point-road. I mean that we inclosed the fast-ground above high water mark. In doing this, we enlarged or extended the fast-ground about 15 or 20 feet round the whole. That part was sometimes overflowed at high tide, and we raised it and extended it. That part taken in was always covered by high water. I mean the old fast-ground was sometimes overflowed; that we took in was always covered at high

(Ball *v.* Slack.)

water. In doing this, we took the mud off from the flats clear down to the mouth of Gunner's creek, about one spit deep, in order that the flats should not be dug into too deep holes. This was done with the consent of Mr. Ball: with his perfect knowledge; he often came and looked at it. He gave his full consent that it should be done. We would not have done it without it. I was in partnership with my father. I superintended, directed, and assisted in the work. We went up Gunner's creek, clean up to the causeway, at the road, taking off the mud. We were full a year, rather better, engaged at the work! No objection was made to our doing it by any body whatever. I think my father left those premises in 1811, about a year after Mr. Ball's death. I took them then, and had them in possession several years, from 1811, till 1819, or 20. Took them from the executors of William Ball, my father, I. Inglis, and Joseph Ball. Part of them, on which the large glass-house stands was leased to Dr. Dyott; the other part, all the rest of the property from about 1819 or 20, until about 1830. I continued to hold until Dyott purchased,—June I think. The part occupied by Dr. Dyott, I fenced off, about three quarters of an acre. I think the executors, or the M'Connell's, took charge of all the flats, from the time that Mr. Dyott first leased. I remember one night, there were men set to work to cut a new channel across them, and I sent in word to the executors, and they came out, and it was stopped. Did not know the men. This was several years ago. Don't distinctly remember the year, some years since Dr. Dyott had the glass house. *The same persons built a log wharf* and sunk it the best part of the way over the creek. A storm came and washed it away. This was 6 or 7 years ago. The present bridge was built about 30 years ago. The last dam 5 or 6 years,—been several. Recollect a dam as long as there has been a stone bridge there,—think in 1795. The sinking of the log wharf impeded the fishing boats in getting up the creek. I have seen them often ground in getting by; I think I can recollect about fifty years. To the best of my knowledge, it has not raised ten feet, I do not believe it has one. I say ten feet to give a little latitude. My signification is that I do not believe it has raised at all. I was three years absent, from 1783 to 1786; besides that I have not been absent from the place more than a month, at any specific time until the year 1830. I resided in the neighbourhood, and carried on business on the place. My age is about 63. There was a wooden bridge below the stone bridge, before the stone bridge, with flood-gates, for a great many years; after the flood-gates were destroyed, they sunk a large sluice there; that did not answer the purpose. I mean by the mouth of Gunner's creek, where it enters into the Delaware at low-water mark. I mean the channel, the deep part of the creek. The distance from high water mark to the mouth of the creek is about 200 yards. I believe it to have been always the same as it is now. I have passed the road and cause-

way forty years, and observed it. The object of the wharf we built was to guard against the overflow of the ground in freshes. Before the wharf was built, there was made ground there; the high water came up to the edge of it, and we extended the wharf beyond that 15 or 20 feet. The beginning was at Mr. Rowland's glass house, beginning at his wharf, surrounded the whole of the made ground to the Point-road, next to the stone wall. The object of building that wall was to keep off the high tide from overflowing the whole place, in freshes. Before there was a bridge or causeway, the tide flowed up the creek, a mile, or mile and a half., It flows now to the dam, and if that were taken away, it could go up the flats a mile. There have been flats always on each side of the creek. A large crop of spatterdocks. The flats along the river were of the same soft mud., The width of the flats, on both sides, was 100 yards. Where the logs of the wharf were put down, it was rather gravelly, —sand, gravel, and mud mixed. When the wharf was first built, the depth of water at high water, on the Delaware, was from three and a half to four feet on the creek, from three to two feet as it run up towards the Point-road. The log wharf sunk was there some time,—can't say whether a year or half a year, before the storm drove it away. They used the bay as harbour for the fishing boats, and to anchor their boats on the flats. I think it was before the coal people began to sink their wharf, that the log wharf was sunk. I mean the wharf that the contention is about. The log wharf was not more than one-third, perhaps one-fourth the way down the creek from the bridge. It was covered on the lower side of the creek from the Point-road. It got so far across the creek, and the executors put a stop to it. It got about two-thirds across the creek, as near as I can recollect. I presume that there were seventy or eighty feet, perhaps a hundred, of wharf. I think that the channel was attempted to be cut before this wharf was sunk. Won't say that it was not simultaneously,—rather think about the same time. Know of but the one wharf sunk. The depth of the water at the face of the wharf my father built, did not diminish materially until the time Dr. Dyott built. Dr Dyott has built the wharf further out on the Delaware side: part of his wharf is out to the channel, so that sea vessels can come up. I think the coal wharf is sunk a little below low water mark, and therefore we could not have taken mud from the place where it is. If it is not below low water mark, we did take the mud from where it is. I have never been round the wharf to examine. At common low water, I believe the water don't leave the wharf. I only speak by guess. Joseph Ball died about seven years ago."

John H. Connell, affirmed. " The children of Joseph Ball are William White Ball, Joseph Inglis Ball, Benjamin Ball, George B. W. Ball, Charles H. Ball, and Harriet S. Ball. Joseph Ball died, I

think in 1825,-October. I rented this place in connexion with Mr. Hewson, in 1816; the glass-works, the lower property on which the glass-house stands, with the flats. It was a verbal lease. We had a steel furnace on the upper part of the ground, for manufactory of steel. The western side of the lane, taking the lot on which the glass-works was erected down to the mouth of Gunner's run. Had the property from 1816 till 1820. Part of the ground on which the pier stands was a part of what we had. I saw them take the mud from off a part of it, to fill up the pier. There is a kind of passage-way under the pier, a kind of bridge. Part of the pier stands out into the water and a part of it on a point of land. Nothing passed except that I gave a notice from Mr. Chauncey. Mr. Slack and Mr. Sansom were at work on the outer end of the pier; they were wharf builders. Mr. Morrison was there, was standing on the wharf, presumed superintending these men. They were throwing the mud in from the point of land, that was above the pier. Don't think there was any mud below the pier. They had top logs on and bolted, and were throwing in mud. I recollect seeing about fifteen or twenty men throwing mud in; but did not pay any particular attention. I went as the agent, representing the interest of these young Balls. I did not give any consent—recollect delivering the note, and telling Mr. Morrison he had better desist from it. He made an observation he had no -hostility to any of our family, that he was merely representing the Lehigh Company. The reason I addressed Mr. Morrison, was, that I looked upon him as representing the company and the most ostensible person. I think I do recollect the property 25 years. I think in 1814 or 15, some persons undertook to finish a wharf on a part of the western side of the creek, and going two-thirds into the creek, into the channel. I recollect seeing persons at work there at the wharf in 1814 or 15, but who authorized them cannot say. Had nothing to do, to prevent its being completed, no dockage paid for boats on the flats. In 1818, I received something over $130 for rafts lying on those premises, commencing at Rowland's steel furnace wharf, and going down to the mouth of Gunner's creek. They lay on the flats outside of the wharf. I received wharfage for flats extending down to the mouth of Gunner's run. The rafts were generally made fast to the wharf. I do not know that I ever saw a boat or vessel made fast to the wharf. The rafts were afloat at high water; the rafts lay along the Delaware front, and inside the point of the run. There is a front of the wharf on the Delaware, and a front towards the creek. I have seen rafts lying double, and the outer raft paid wharfage to me. Will not undertake to say, that this lay out to the mouth of the run. When a raft was made fast outside to a raft made fast to the wharf, I have received twenty-five cents a day for the inner, and twelve and a half for the outer. I do not recollect any instance, in which the raft was not either fastened to the wharf, or to a raft inside.

They lay on the wharf, in 1814 or 15, very near the bridge. They did not get as far down as where the pier now stands, that's very certain. When I saw the men filling up the pier, they were standing on the mud, throwing the mud into scows or arks. They were anchored on the eastern side of the pier. I always call the eastern side the upper side. I supposed something like twelve or fifteen feet above the pier. I mean the eastern side of the pier. The ark was something like twelve or fifteen feet, and the men were on the upper side of the pier. Did not see the mud thrown from the ark into the pier."

Christian Pote, sworn. " I have known the mouth of Gunner's creek about 27, 8, or 9 years. Was in the habit of going in and out of the creek. The direction I always took to get into the mouth of that creek at low water, was to range Wood street. The inward corner of the upper side of the pier stood dry. The lower corner of the inside stands in the channel of the old creek. The out end from the in corner on the lower side I have seen 8 or 10 feet dry, may be more, never measured it. I should say the mouth of the creek to the nearest part of where the pier now stands, is 25 or 30 feet, as near as I can tell. The piece of ground between that and the mouth of the creek, I have seen that dry ; cannot say whether exactly at low water or not. The water now comes up to the very pier. It has been, may be, 15 or 18 months that I have perceived it to do so. It has been occasioned by their digging mud from the lower side, and having vessels laying there making beds. Saw persons two or three days after that pier was sunk, digging mud there. There appeared to be 10, 15, or 20 persons employed in it. They put the mud into that pier, as fast as the wharf builders built the pier up. There was a scow or ark lying on the upper side, on the eastern side up the river. They took the mud from both sides of the pier. There is an old log, on a big stone, one end of the log sticks out from under the pier now. I have stood on that large stone, now buried inside of that pier,—that I have been on dry. That stone was commonly dry at low water, never knew any variation in the mouth of the creek in my time, before the pier was built. I lived in Wood street part of the time, part of the time above Dr. Dyott's factory, and part of the time in Beach street, with the exception of 3 or 4 months, 4 or 5 years ago, I lived in Jersey. I have lived in that neighbourhood all my life. I followed fishing. I think in 1814 or 15, Mr. Earle and Mr. Ridgway attempted to cut a new creek there—confident Mr. Earle was one. I have followed the business of glass-blowing on Mr. Dyott's premises, and on James Bulland's, now Rowland's. On Mr. Dyott's premises when Mr. Dyott had them ; worked for Dyott, and previously for John H. Connell and Mr. Hewson. Followed glass-blowing off and on about seventeen years. Sometimes glass-blowing and sometimes fishing. In fishing,

(Ball *v.* Slack.)

worked as a hired hand—sometimes at Darby creek, sometimes at Tinicum, Thompson's point; and all down the river. I believe I was about 13 years of age when I commenced fishing. Wood street is in Kensington, the upper end. If you followed Wood street strait to the river, it would come out at the mouth of the creek. Wood street is now crooked. Wood street if prolonged, would strike the river about forty or fifty feet below the pier. Our fishing boats returning would draw about 18 or 20 inches or two feet. I cannot tell whether the stone I spoke of, was a rock or not, two or three feet bare on the top, may have been put there or not, not very high, flat on the top, three or four inches above the mud, might have been more, never measured it. I have been out there bathing frequently—numbers of boats employed in fishing that came in and out of that creek. Generally lay on the flats, anchored on them on the east and south side, both—anchored at high water, and when the tide went out they lay on the mud. Might have been 30 or 40 that generally anchored in that place. The people that owned the boats lived in Queen street, and Wood street, &c. I am now employed in Dr. Dyott's factory. Have been employed there this time a little better than three months. Worked before with him. Some of the fishermen owned on the river, and some did not, but not above Wood street, but not so as to touch the creek, that I know of. It is common for one man to own more than one boat.' Sometimes two or three. The height of the old wharf, above the mud is about five feet, the face or front of it. There has been a new part added to the old—built out. Still a great many boats for fishing are there, sometimes for shad, sometimes rock fish, sometimes cat fish. I said that I had seen the mud bare on the inner side of the pier, two or three days after that pier was sunk; and frequently before it. Don't know that it was under any particular circumstances. I suppose it would be bare now, if it were not for their digging it away, and the heavy vessels lying there. When I saw it bare as mentioned, they were throwing in mud from the lower side, and the upper side both. When the tide was in, the water came up to the road, and was then one and a half to two feet deep, all along the stone wall, on the flats. Not much channel there along the road, when the tide is down."

James Cornwall. " I have been acquainted with the ground something like thirty years; have seen the pier pretty often; the place where it stands has, before the pier was built, been free of water, at times; at low water, generally bare a considerable way down, sometimes all the way to the point; from the upper side of the pier it was commonly bare at common tides; won't pretend to say that it was much farther down; the upper side has been bare at common tides; as to the other, won't pretend to say; sometimes very low tides; then it would be bare clear away out beyond the point of the creek; some little water puddles, in places, in the channel of the

(Ball *v.* Slack.)

creek, in some parts; have seen it so at the point, that nothing there but puddles; have known a change in the mouth of the creek; there is a little difference now from what used to be; the pier has altered the mouth of the creek; it has thrown up a bar near the mouth, and turned it alongside the pier; it appears to have thrown the mouth higher up; the mouth of the creek does not empty down exactly as it did; never observed any such alteration before the pier was built; it appears now to empty out nearer to the pier than it formerly did; it turns the mouth further up the river; you could trace the line of the creek 30 or 40 feet below the pier—not much less. I am going on 53 years of age; my memory is distinct back about 28 years, of this ground; the north-west wind produces extraordinary low tide; if it lasts a considerable time, it produces more. I am a house carpenter; I have sometimes known when the tide has been so that the water would hardly leave the flats for any distance hardly; the depth of water at the bridge at high water, is eighteen inches or two feet."

Christian Faunce, affirmed. "I have known this property since my memory, (I am in my fifty-second year,) 47 or 48 years, I suppose; I cannot say, that the bed of the creek, the channel of the creek, the course of it has altered any except since the pier was built; the place, the mud-flats, where the pier stands now, was left bare at common low water; perhaps 20 or 30 feet below the pier, on the inside part of the pier; the lower side, the south side. I live a little below the creek; my property adjoins it nearly; I see it daily; have not been in the habit of going in and out much; can't say I ever took any particular observation as to where the mouth went into the Delaware; it always appeared to me that the mouth of the creek led into the Delaware pretty much in one place; the bed of the creek is deep enough at any time to see where it is."

John Smith, sworn. "I have frequented about that creek as long as I can remember; am past 34 years old; have followed fishing, and worked within 100 or 200 yards of it continually; before the pier was built, the ground on which it stands was chiefly bare at common low water, some parts of it, as well as I recollect; I have frequently seen where the pier was put some of it bare, whether all I cannot say; I helped to take a great deal of mud off from that point; probably 13 years ago; may have been a little more or less; for doing up some property there of Mr. Hewson or Mr. Ball; I did it for Mr. Hewson, at the time he had it; took it off the point, above where the pier stands; the mud was generally hard there, further down, about where the pier stands; have not seen any mud taken since the pier was erected; have seen a machine the lower side of the pier; they had scows to put the mud in, and were making it deeper to float their coal vessels; this was two or three years ago, I believe. The mouth of the creek has not varied to my recol-

(Ball *v.* Slack.)

lection, an inch before the pier was built. As a fisherman used to go into the creek. Had no occasion to go any where when the water was up; could go any where. When the tide was down, we went very low down into the mouth of the creek. I never took any particular range, but always, at dead low water, went in about Wood street. Wood street is thrown up a little I believe, of late years. Cannot tell exactly when it was I saw the machine there. The mud taken off 13 or 14 years, was put on this property that Dr. Dyott claims, by direction of John Hewson; helped my father carry it off.".

Jacob Faunce, sworn.—" I have followed fishing about 40 years. Have seen the mouth of Gunner's creek pretty often. Have seen the pier. Have seen the ground bare on it, but did not take any particular notice. Can't say whether it came down to it or not. Can't tell whether the mouth of Gunner's creek changed before the pier was erected; it seems to me to have pretty much the course it always did. Have not made a practice much of going up that creek, this many years."

The *Defendants* then gave in evidence a deed dated the 16th of May, 1744, from Anthony Palmer, with Thomasine his wife, to George Baker; and several mesne conveyances by which the title to a certain tract adjoining that of the plaintiffs, was vested in the Lehigh Coal and Navigation Company, under whom the defendants held. In the deed to the Lehigh Coal and Navigation Company, this tract of land is described as follows: " A certain lot or piece of land situate in Kensington, in the township of the Northern Liberties, and county of Philadelphia, containing in breadth on Queen street, or the road to Point-no-point, 70 feet; and extending in depth from the said road, down to low water mark of the Delaware river. Bounded southwestward by John George Rees's lot, northwestward by said Queen street, northeastward by land of William Shippen, and southeastward by the river Delaware." The defendants also produced a license dated the 21st of May, 1829, from the Board of Wardens, for the erection of a wharf, and gave the following parol evidence:—

John Rice sworn.—" I reside near the property in Kensington: born there, within forty feet of the Brusstar lot, the lot on which the company have built their long wharf: follow fishing and catching shad: was born 13th April, 1766: going on 67 years old. Before 1774 a boy: after the revolution occurred, was pretty active: before, was a boy and used to go, to swim up the creek. There was a flood-gate below where the bridge now is, and two sluices; before 1774, I used to cross and go up the place where Dyott's is. Two large Locust trees: when the British were in Philadelphia, the

guard used to lay there. The old house, Baker's, was on the lot at that time. At that time it was banked up with a temporary bank of logs; before that it was banked off about 70 paces down: logs may lay there yet. Outside of the wharf were mud flats to low water mark. When the British were in Philadelphia, the flats at that time, and for a year after; my father fished then; I fished then with my father. Don't believe at that time, to the best of my memory, that the flats were more than 60 or 70 feet from high water mark. The building that Mr. Dyott has now, the upper one: dye house was there, and at high water when fishing, we used to go near to that: we hauled the seine there: no wharf then there: used to tread a log at high water. It was called the old glass house. When the British left Philadelphia, they opened the dam of the old creek: the old low water mark was not more than 50 or 60 yards from that place: very little point at that time. New channel nearer to Dr. Dyott's than the old one. In 1805, they erected this present bridge. The centre of the bridge is 14 paces above the flood-gate: 23 paces further down to the lower sluice at that time. That I consider at that time to be the lowermost part of the creek, and the flood-gate the uppermost. At the Rice's line, and Brusstar's lot. I stept off a few days ago, from the Point-road to which in 1805, was low water mark, 155 paces; from the same starting place, it is now 185 paces. Baker's wharf was built about 1805, and that was built somewhere about low water mark; I found my judgment from that. The next view I took was at the old glass-house wharf, two or three days ago. I remember that years ago, that I used to go there at low water. I did not get on the wharf; but saw it by the willow tree, 155 paces. Continued on—last winter I went to the steam-boat when she lay there, and took a view of the creek. I stepped it off, and found it was fifty paces from the pier to the steam-boat. Where she lay, was in 1805, altogether outside of low water mark. The river was frozen last winter; the steam-boat lay just below where the upper creek came out in 1805: the lower part just below: I took a range then up the middle part of the bank wharf; the new works; new glass-house wharf put down by Mr. Ball many years ago. I thought that the channel run nearly the course of that: lower than now. The upper part was 14 paces below the centre of the bridge. My step is about a yard: may be something less. Used to step a yard very exact. I did not take much notice of the ground when the pier was sunk. In 1805, Dr. Shippen who was well acquainted with my mother, owned the flats above Brusstar's lot; offered to sell to my mother. I thought the flats were about 30 paces below; above Brusstar's lot: shortly after the pier was finished, they brought their vessels and loaded coal on the lower side: large schooners and brigs; don't know whether they floated at low water. I have seen the slag and cinder laying outside of the wharf. With regard to the pier—I remember well, I think, that

(Ball v. Slack.)

where the pier is now, some years back, part of the pier was the deepest water, inside of the stone bar, which lies off part of their property and lower part of the Brusstar lot. Vessels worked in when the tide was low—tolerable good water. The stone bar is well known to every body. The company have buoyed the bar sometimes—I have seen it buoyed. I saw a large vessel laying on it last fall, I think. There is a small channel between the stone bar, and the Rice's wharf; not so much as there used to be. One half of the mud taken up by the machine was thrown on front of the Rice's lot—one half belonged to me. It was put on the half down. I think it was two years after the pier was built. The mud they brought out was generally pretty sandy; made ground at that time. Conrad Baker's wharf was one of my marks, the lower one, when I took my view. The old steel furnace was the other. I heard that I was summoned as a witness, and, that I would be examined—never told a soul. Told Mr. Barker that the creek was moved. The time I refer for the moving down was 1805. I never thought in going in that the creek ranged with Wood street. There was no Wood street. I know of no Wood street. If Wood street were opened, it would come out 40 or 50 paces lower down than the line of the two lots. According to the plan, it takes along the fence of the coal company. It appears to me that it takes the counting house on the wharf. Twenty years ago, to the Delaware, it would go 40 or 50 paces below the line of the coal lot. I gave surveyor my opinion that it was bent to make an elbow. The Rice property is next to the Binder lot, on the southwest side, from Queen street, to the low water mark of the river Delaware. The line of the Rice property would come within about 20 feet of the pier. If the creek emptied into the Delaware 40 feet below the pier, it would run 20 feet on the Rice property.

Martin Cramp, sworn.—"I reside in Kensington, and have resided there 69 years, since my birth. Binder, and I own part of the property next to the Lehigh company's lot. My business is that of a fisherman. I can recollect from 56 to 57 years. I remember that the creek makes more down now within a few years, than it did many years ago. It emptied itself many years ago above the coal pier of the coal company, about ten or fifteen yards, perhaps, more above. I used to go up and down that creek frequently. I did know the old glass works above the creek. They used to throw their cinders out of doors; they were near enough high water mark, and they drifted to one place and another. At the new works, I see a good deal of stuff thrown out the south side of their long wharf. I had boats; they used to lay on the mud flats at low water. The bar of rocks lies the lower side of the pier of the coal company. There was deep water between the shore and the bar. After entering the passage and running up about 50 yards, they might go either northeast or south any one. It is 15 or 20 years, or more,

(Ball *v.* Slack.)

since I first observed an alteration in the creek. It went on gra-
dually; some years more and some less. The channel of the creek
has changed all the way down from the bridge. It fills up ever
since it was stopped out. Ever since the dam was built above the
bridge. I cannot remember when the dam was first put there. It
is beyond my recollection the first part of it; it has been broke three
or four times. There has been a dam always. When I first knew
it, it was an old dam. There was a flood-gate there, and that let
the tide out and in. It was partly where the bridge is now, the
arch at the road; right under the middle of the road. I do not say
that that made the alteration in the creek. I cannot remember
where the road began; never took much notice then of such things
as did not concern me. When I went into Gunner's creek, I ranged it
with nothing. Going up or down, I ranged it with my oars, as the
tide was. I have lived in the property thirty-two years. I received
that by my wife, eight or nine years ago. Never lived on that I had
by my wife. I lived in a house about three or four hundred yards
from the creek, below—fished from there. My boats lay down;
away down; I forget the name of the street; about one hundred
yards above. I lived there before the British came to Philadel-
phia—don't know when that was. After that, I lived with Peter
Baker as a hired boy; that was near there, above Jacob Faunce's
line. Our boats then lay right off there. Sometimes at the wharf,
according as how the tide was. I commenced fishing for myself,
and lived close by Peter Baker's; at first with him. Then lived with
my mother-in-law, a year or so—the house that my wife owns now,
Rice's. Owned one or two boats. They staid mostly on the shore
by the wharf, Rice's wharf. Next lived where I live now, above
Wood street; I suppose about 40 or 50 yards; in Queen street.
Boats have been kept sometimes in the creek, and sometimes at the
wharf—mostly at the wharf though. The distance from the road
along the creek to the pier, is from 150 to 200 yards. I have seen
broken pots laying outside of the wharf towards the creek, not
towards the Delaware. Married Rice's sister 40 years or better.
There has been a division of the property between Mr. Rice and
Binder and me; the line run. The lot next to the coal company
belongs to Binder and me: next to that Binder's, then mine, then
Rice's. The side of the pier this way, ranges with the company's
yard. Binder and my lot, then next is twenty-four or five feet wide.
Then Binder's about twenty-two feet. Then mine twenty-five feet;
then Rice's the balance of the Rice lot. There is very little water
in going into the creek at low water now. So low that you cannot
get up with a small boat now. I have taken a haul or two with a
small seine above the creek; hauled in above the glass-house. When
I first remember, the road was lower down, and there were sluices
in it. Next was a flood-gate, somewhere about where the bridge is
now. That was when the British were in Philadelphia; I believe

(Ball v. Slack.)

torn away. The tide run up two miles before there was any dam. I know that from the time the bridge was broke. I remember a log or two laying there; may be a hundred yards from the bridge; the left hand going up the bridge. I remember the building of a wharf on the Ball side, but cannot say what year it was built. 1 mean Rowland's steel furnace by the old glass-house."

Peter H. Pote, affirmed.—"Live in Wood street. Shall be 60 years old 19th of February. Born there. Acquainted with Gunner's creek, ever since I was ten years of age, going in and out, was one year absent, the year 1794. The tongue of land has increased within 18 or 20 years to my recollection. It has been owing to Mr. Rowland's building a wharf, out near where the old glass-house, steam factory lot called now. I remember the building of the wharf, cannot exactly state the year. It has appeared to me to be continually increasing ever since that. It has had the effect to gather in loose mud and one thing and another, at the mouth. The mouth is about 30 or 40 feet from where it was formerly. My business was fishing. The boats generally lay upon the flats that the coal company owns at this time; sometimes at the old bridge. I was laying just outside of the dam, when it was carried away in 1831; laying just below where Dr. Dyott's wharf now is; exactly where the stream of water came out. It was about five hours ebb, within two hours of low water. The course the water took was within about 50 yards from the east side of the coal pier, the upper side towards Mr. Dyott's above the pier, up the river. Dr. Dyott had begun his wharf coming along towards the coal pier. It had then come farther than the old wharf, very trifling, might have been in a range with the old one up at that time. I recollect the old sluices, they were before the present bridge; the flood-gates first, then the sluices, then the bridge. The road ran on the dam. I think it was day before yesterday, I saw Mr. Dyott's men carrying mud, and throwing out on the side his glass-works are, on the cinders towards his works; can't tell where they brought the mud from. Saw them unload but one at that time. I saw Mr. Michael Dyott's men sink their scows with mud at the time the dam gave away. I cannot say, whether the increase of the tongue of land had any effect in turning the mouth of the creek, where it empties at low water. The fishermen's boats continue to lie about there on the flats. The dam broke on the inside. The quantity of water coming down, the body of rain, caused it. I saw the logs that came down grounded on the point on both sides, that made some stoppage of the water. The whole of the flats were covered with water, when the water rushed down; remained covered from three to four hours, as long as the water came passing down out of the dam. When the tide was low, the creek took out in the old channel, the same bed as before. When the tide was high both out and above.

(Ball *v.* Slack.)

I am able to say that the mouth has changed 30 to 40 feet within 20 years. This is my opinion. I took no range, had to go lower down to get in. We used to range by Wood street in old times, to come in against Wood street, come up along shore and sound with our oars till we got in. All the change that I speak of is within 20 years. Know of no change before, since Mr. Rowland's wharf was built. It might have been a couple of months before the dam was repaired completely. It was where there is no wharf, that they were throwing the mud, day before yesterday, taken out of a scow by four men. It was Dyott's scow; did not know any of the men—was within 15 yards. First observed the change of the creek within 20 years; can't pretend to say how long it has been as it now is. The whole change that I speak of was within eighteen or or twenty years ago. It is making at this present time, farther down, notwithstanding the pier. The mouth of the creek strikes about 10 feet above the upper corner of the pier, the low water mark of the creek, both sides of the creek run under the platform, between the pier and pier head; the increase did not go on very fast, 18 or 20 years to make 30 or 40 feet. Follow fishing yet: always made a custom of going up and down that creek: never had any other place to land: keep my boats, on the coal company's flats, on the farther side of the creek; I have permission from the company to let my boats lie there, when they are not bringing in coal, so that we keep them out of their way. Never saw the mud bare, below the pier, on the outside of the creek. When the dam gave way, the water made a new channel through the mud, and that was 50 yards above where it is now. It might be 30 or 40 yards, below the mouth of the creek where we struck that we ranged with Wood street."

Frederick Tees, affirmed.—" Live up the Point road : lived there 35 years, last day of last February: have known Gunner's creek above 50 years : lived part of the time in Kensington, part of the time, adjoining on the creek. Last July was a year the dam carried away. The water took a right straight course from the bridge into the river: I remember the course of the creek, 30 or 40 years, but cannot say where it came into the river Delaware, but to the best of my knowledge, considerably higher up than it does now : near the glass-house. Judge by my own observation, going up and down for 30 or 40 years : can't say for certain as to the spot: I have fished above the bridge, but more outside. I do not know when it first struck my judgment that it was higher up, no particular object that I judge by. I recollect the flood-gate and sluices. The flood-gate was in the middle of the road : the sluice along the side. The road ran where it does now. There was only one sluice at the time I am speaking of: flood-gate and sluice both."

William Binder, sworn.—" Been acquainted with this creek some-

(Ball *v.* Slack.)

thing rising 50 years: born in Philadelphia.: my grandmother lived in that neighbourhood: when the British came to Philadelphia, my father being in Philadelphia, my mother took refuge there: 40 years ago: nearly in a state of nature: no improvement above, till Norris's wharf at that time, I used to swim in it: just after the British left Philadelphia, my father settled there. The creek emptied itself in a nearly straight line, except a little cove at the point, on the north side towards Ball's: they used to bring wood up the creek to the bridge: a vessel with wood coming up to the bridge, would come up in a straight line: where the bridge now is was a flood-gate, below that a sluice. I have seen the present pier head. Should not think the distance from the bridge to the mouth of the creek was then more than 150 yards,—never measured it,—short distance. I own property immediately adjoining. The company's pier is far south of where the creek was. The company's pier is away out in deep water. I should suppose the creek ran and emptied above the pier, 150 feet, at least 100 above. The property immediately adjoining was my father-in-law's: next adjoining the company's lot or orchard: never gave the creek more thought after I left Kensington: left Kensington in about 1790. The property of my brother and myself, own the lot adjoining the coal company's lot. Where the company's pier now stands I think must have been near the channel; there are rocks outside, on which people used to go and cut their names on them. The accumulation is from year to year, no great amount in a year. Petty's island has increased greatly and so has Windmill island."

Fanny Pote, affirmed.—"I am better than 70 years old: live in Kensington, in Wood street: lived there above 60 years, remember the creek they call Gunner's run. I do not know rightly how far it ran up the meadows. The creek used to run straight out from the bridge, until you come to low water mark, and then it had a little turn. It has filled up a great deal, and has thrown the creek more down than it used to be. They throw any thing out of the glass-house, and it turns the creek more down than it used to be. Ever since they have been there at work, they have been in the habit of throwing things down. Been in and out of the creek in a boat, many times: many hundred times: the mouth of the creek straight out from the bridge, just at the low water mark a little turned. Did not take any notice of any rocks. I cannot tell to what time the course was straight out from the bridge. I never saw the change before to-day. I know it has filled up, and must come from somewhere. I never saw any body throw any thing in. I went up to my son's, this morning, he lives above the glass-house, Jacob Pote, I just looked over, and found that the creek was away down to what it used to be. Never took much notice of it. I cannot tell to what year it ran straight. Sometimes the flats get partly all

(Ball *v.* Slack.)

dry. Sometimes they don't, just according to the tide. Sometimes, they would have to row a piece round to get into the creek. Could tell easy enough when they got far enough. My husband dead near 15 years. He had quit six or seven years before he died. Up to that time, I had not been in the habit of watching the creek: Not 50 years that I used to go up and down the creek: I guess it is better than 40 years: it is not 40 years since I stopped going up and down: very often went up and down since he followed fishing, but not since it has made down so low. Can't tell how long since, I went up and down. I live in Wood street."

Isaac Coates, sworn.—" My residence in Beach street, about 100 feet from Palmer, three squares from Wood street. Lived before the British came here, apprentice to Manuel Eyre. Was born in 1761; going on 72. Remember Gunner's Creek, when I was a boy. I have passed backwards and forwards over the bridge. The creek used to eject out pretty straight until it got out a piece, and then took a turn way down towards Wood street, towards the city. I had no particular mark of the creek's going out. But it emptied into the river somewhere about the upper side of the pier. The mouth of the creek, above the upper side of the pier, came pretty close, I guess, to the pier. All the notice I have taken, about two years ago, I went to see Lawrence the wharf builder—the wharf near completed. I saw a thoroughfare through the pier. I said, I think, the creek was higher than this. I am a ship-carpenter. I never came off in a boat. Saw a great many freshets."

The following memorandum, in the handwriting of John Lukens, formerly Surveyor General, was then given in evidence.

## " Memo. March 16, 1773."

" Being called upon to go in company with Hugh Roberts, Joseph Fox and Charles West, to the bridge over Gunner's run or creek, on the road to Point-no-Point, and after placing a surveying instrument over where they said the middle of the creek formerly was. They set the course to the place they said the creek's mouth at low water mark was. The same was found to be S. 7° E. From the same station, the chimney in Marmaduke Cooper's new house, bears S. 15° E. and the steeple of Christ Church bears S. 43° 45' W. Carefully examined.

Pr. Jno. Lukens, Sr. Gen."

Benjamin Moore. "I was, last Thursday, on the bridge that crosses Gunner's creek. I endeavoured to ascertain the station mentioned in the memorandum as near as I could. After taking observation of the course of the creek above the bridge, with the eye, and some distance below the bridge, I took a station, thirty feet south-west of the middle of the bridge, rather nearer W. than S. W.

and ten feet from the S. E. wall of the bridge. I then put the com-
pass to bear S. 7° E. as mentioned in the memorandum, and directed
a person to stand in the range between Dr. Dyott's wharf, the new
projection into the creek, and the pier head, the west end of the
pier. And in the range with the course that I took, put up a pole
there. I then got it measured from that pole to the pier head, 220
feet. I then took the course to the chimney of the house, that was
said belonged to Isaac Cooper, son of Marmaduke Cooper, found it
bore S. 15° E. differing half a degree from the memorandum;
strong 15° E. full. Then took the course to the steeple of Christ
Church; found that to be S. 43°. 45' W. same as in the paper.
Then measured from the bridge to the head of the pier, the north
end I call it, according to the course of the creek. It measured
520 feet; would not be much less in a direct line. Then tried the
courses of some of the streets that had been laid down about that
time or a little before, in order to ascertain how near the compass
these traversed now. I found it varied about half a degree. I felt
pretty well satisfied in my mind, that the station I had was not far off
from the station spoken of in the paper. I believe I had it as near as it
could be ascertained. Mr. Enoch Lewis told me he had been en-
gaged in an operation of this sort.' He was here during this trial.
When he went out of court, he told me he was very unwell, that he
would have to go home. His home is West-town School. He thought
it was likely they would not want him here very soon. After I went
home I compared what I had done with the old map. Applied to
the map the measure from the bridge to the Brusstar lot, to see how
it would correspond; likewise the angle that Queen street now
made with the course S. 7° E., and found that a line drawn from
the point where I stood, that is this measure on the map, to the an-
gular point, the point the angle made, would pass through that nar-
row part that is delineated on the plan, Evans'. Last winter, some-
time in December I think it was, when the river was frozen over, it
was a favourable opportunity to get a measurement across from
Bishop street; it runs down· from Queen street, parallel to the lines
of the Brusstar lot, &c. I measured across at right angles with
Bishop street, to the S. W. side of the company's wharf, up the
river—put a nail in a post—that line was right, the S. W. line of
the company's wharf. It was 506 feet from Queen street. Then
measured across the wharf; found that within about two feet of the
line. It was not far in, 12° E. Their N. E. line went about two
feet further. Did not range the pier, it was a very cold day. The
most prominent part was within the line, two feet from there up to
Queen street. I should suppose from the appearance, that the pier
was not far from right. Could not be far from being within the
Brusstar lot. Its exact position could only be determined by going
up to Queen street, and ranging down; but that I did not do; it was
very cold weather. The reason' I took thirty feet S. was that I

(Ball *v.* Slack.)

ranged the creek above and below, and thought it about right. The pole not standing there now. The pole appeared to me to be about ten feet off from Dr. Dyott's new work, ten or twelve feet. I measured with a tape-line from Queen street down. The space occupied by the bridge is fifty-nine feet—the arch twenty-one feet. Been acquainted with that neighbourhood about four years. Never till I got into the business of surveying."

Calvin H. Barker, sworn. " I was at the dam soon after it broke, a year ago last summer, sometime in the summer. The water run pretty nearly a straight course out above the range of piles, the row of piles standing on that side of the creek, called the company's N. line. There is two hundred foot between that line and the seventy feet lot. The general range of the water was ten or fifteen feet above the piles. Ran out to the river. It was several weeks before they got the dam repaired. They repaired it several times and it broke out. It run out that course, till it got down. It run out there until it got so low, that the tide left it, the old channel being lower. It was three or four weeks before the dam was finally mended : it might be more. There were arks sunk across the new channel, loaded with mud ; filled there by Dr. Dyott's people. They were building a wharf ; at work every day. I think that the arks loaded with mud came from up the river, from up near the Bake-house. There is no particular use made of the flats opposite the glass-house. Very soft mud—large business there. Out of the houses next the bridge, they throw their refuse stuff into the water. The upper one on the creek tumble it right out rather into the creek. Have seen them throwing it out. Commenced working there two years ago last April, saw them soon after. Working for the Lehigh Company. Know nothing of the property before that time. I have seen mud taken off outside in the Delaware, and put into Dr. Dyott's wharf. Am employed by the company as clerk, agent in shipping coal. No coal there now, nor since July."

Samuel H. Fisher, sworn. " The pier is 80 feet, two inches short, from the outer part to the inner. Intended to be 80 by 50, a little short of both. Three or four months building the pier. On the N. E. side, it comes to their line. It does not come to the company's south line by 16 or 18 feet, on the side next to the Rice's property. When I went to Ball's line or basin, with the Lehigh Company, all the mud that was thrown into that pier for the purpose of filling it up, with the exception of four, certainly six ark loads was dug from the company's flats, S. W. of the creek, the inner side of the creek. Superintended the building of the pier. Took off two hundred feet, a foot thick—not all put into the pier, a part was put on the wharf on the N. W. part of their property on Queen street. From four to six ark loads of mud and sand I removed from this tongue of land, north of the pier, probably thirty feet from the pier; commencing

(Ball *v.* Slack.)

six to ten feet north of the pier up towards Dr. Dyott. Never saw any rocks, took it off, eight to ten inches in depth; considerable portion sand."

James Altemus, sworn. "Reside in West Kensington. Lived there 33 years, age 63. My recollection runs back 40 years. Lived in East Kensington, from 1792 to 1794. Was in my 24th year when I moved to Kensington. About 18 or 20 years ago, seen from the bridge, the creek bore up from the bridge, and there made a turn and bore down. I have seen the pier of the Coal Company. It appeared to be joining on Mr. Rice where the creek emptied into the Delaware, according to my calculation, it did so, about 40 feet from the upper side of Hewson's landing. In 1818, I was assessor and collector. The property was assessed as Hewson's. Earle and Ridgway come next to Hewson, I think 200 feet. Then Samuel Brusstar's lot. We concluded that they went down to low water mark, we did not think there was any thing between them and the river Delaware. I received the taxes, Mr. Earle paid the whole tax on their lot. Mr. Brusstar himself, on his lot. Was last collector in 1817–8. Only two years. Collected in 1818 the tax of 1817. In making the assessment followed the triennial assessment, which had been the year before. In 1818, Gunner's creek did not run in front of the Brusstar-lot."

Michael Day, affirmed. "Reside in Kensington. Have collected the taxes in East Kensington twelve years, and in West Kensington three years. The Frankford road is the line between East and West, the Cohocksink creek the northern boundary; thence Queen street, call it the Point-road generally. For several years, I collected from the Benton estate, a part, and the balance from Clayton Earle. I assessed all that property for something like 13 years, I think, we considered them to go to low water mark. Never undertook to measure the distance. This is the assessment book for 1819, my signature at the end.

Page 15.   John Hewson, Jun., Glass-house and lot,   $2000
           Earle and Ridgway, Water-lot, 360 feet,   1867
    That means on Queen street.
           Samuel Brusstar's estate, Water-lot, 70 feet, 267

That is on Queen street, lying along Wood street. I assessed it in that way for several years; then it was assessed in the name of the Coal Company. I collected the taxes, Clayton Earle pays for 160 feet, the Coal Company I suppose 270 feet. 1829 was the last year I collected. The year 1832, last assessment. I never noticed any change of the creek, passed there a thousand times, if it has had any I have not observed it, it has been so gradual. I recollect travelling backward and forward there for something like 30 or 40 years. I considered ourselves as assessing all north of the creek to

(Ball *v.* Slack.)

the Hewson glass-house.   Never took notice that the creek cut off the front of those lots.   I have lived within four or five squares of this place, for something like 50 years.   Was absent some part of the time, but that was my regular home.   Never absent more than a year at a time, and not more than twice, as much as a year.   The first in my early life, and in 1812–3 in North Carolina, about fifteen months."

John Sexton, affirmed.   " Am a wharf builder, have been 38 years in this city.   It is very commonly the case, for them to fill up where a wharf extends out, particularly on the lower side by the ebb tide. In some situations it fills up with the flood.   It depends on the situation of the river in my opinion.   I have seen wharves built within twenty-five years, that have filled up a foot every year or nearly so. The wharf on the upper side of Pegg's run, sunk by Conarrow, that Ephraim Haines occupies now.   There was when it was sunk, twenty-two or three years ago, something like eighteen or nineteen feet of water, and now it runs bare long before low-water.   Another instance on the south side of Cohocksink creek, 19 feet water when sunk.   Now about two feet water.   The wharf at Pegg's run is filled up most at the front.   It is more than sixty feet from where low-water mark then was, to where it is bare now, Cohocksink creek the same.   The wharf at Cohocksink creek built some years before Mr. Haines'; think in 1796 or 7, not certain which. In a certain set of tides, it will fill up and makes land and bars, particularly where there is any obstruction thrown in the way.   I don't know of any greater depth of water filled up than that I have mentioned.   I did not build Rowland's wharf, don't recollect the time when it was built."

The plaintiff then gave the following additional testimony.

John Hewson, called again.   " I omitted in my testimony the other day, that Mr. William Ball authorized me and my father to keep off any person from taking off mud.   I stated that no person made any attempt.   I correct it; several persons did attempt it. Also since the executors, I forget the gentleman's name.   I think Mr. Earle attempted to take some of that mud, and was stopped by the executors.   To my knowledge for 55 years, Mr. Ball and his successors.   With respect to the position of the rocks.   There is a rock lays under the ground, on which the S. W. glass-house now stands.   I have made several attempts to get wells sunk, have got down 3 or 4 feet and come to the rock and desisted.   This rock extends itself about two-thirds of the made ground to the creek, and forms a natural barrier to the creek.   The rock which extends out to the creek is about five feet above the level of the water at low-water in the creek.   I am well acquainted with the bed of that creek.   I brought some shallop loads of stone for Mr. Leiper up it.

(Ball v. Slack.)

I presume it is about 300 yards from Rowland's wharf to what is called the mouth of the creek. This reef of rocks in the river runs up and down the river in a southerly direction. I never examined the character of the stone of the rocks in the river. They lay off in the river, about 150 yards, rather below the mouth of the creek, but very little. Any one may see the ripple of the rocks when the tide is half down. The rock is nearer to the lower glass-house than the upper one; rather between. When the pots are broken, I had them thrown out to cool, but they are so valuable, that we had them collected, to grind over, to make new pots; nothing has been thrown there to fill up, but about 40 feet of the ground close up to the bridge has been taken away by the wash of the water. I remember an old trunk up by the bridge, a part of it lays there yet. There was a little trunk that carried off the water from the wharf out the creek. It is buried in the earth. The mouth of that trunk was just over the wharf. The pond up above, where some of Mr. Dyott's buildings now stand. This is under the earth 6 or 7 feet. The rock is 40 or 50 feet from the side of the wharf; that ground that I banked in. The change of the creek from the bridge to the land opposite the rock, has taken off about 40 or 50 feet from Mr. Ball's ground. There have been 15 feet added to the old wharf on the creek side, on the made ground, within the last fifty years, beginning at the Point-road. About the same on the Delaware side. I know the time when the channel was about 40 feet above the present bridge."

Frederick Aufert, sworn. "I remember when the dam was broke, I went to look at it, summer before last. There were several arks laid across the creek at the time, loaded with coal; how many I don't know, there were several at high water in the middle of the creek, they were totally under; so that a batteau could float over, as the tide fell they had to haul the batteau over. There were a few logs floated down and came crosswise. The arks were lying about midway up the creek. Of course, they had an effect, they stopped the creek as the water fell, and the water had to find some way to get out. Don't recollect how long they remained there. I do not recollect seeing them before the dam broke. I went down to see the dam, and saw them there, they stopped the water and it went bodily over all the flats. Opposite the old creek, where the sluice used to come out, that is about 30 or 40 feet this side of where the bridge is now, I saw some rocks, and appeared to me as if they were founded in the bottom, the opposite side of the creek, towards the Delaware. I did not take notice what way they extended, they appeared to be level with the mud; how large I could not tell. I have been on them. Some years back, I helped to dig mud off the flats, this side of the creek, towards the Point-road, dug for me, and I helped carry it out. It joined the Brusstar line. Earle got it afterwards, don't know who had it before: They had the privilege

(Ball *v.* Slack.)

of taking mud out for their dam. This was in 1806; I mean the dam, not the present dam, but the one before, close up to the bridge. I helped to carry the mud. My employers were David Faunce and Francis Hoffman. The best part of the dam was built of mud from there. I carried mud there eleven days. Had no scows: hand barrows. The dam broke in the night, the next morning I went to look at it: it was forenoon: I can't tell whether I had taken breakfast, or after. I am a shoemaker by trade; and' fishing. I never measured the distance from my house to the dam. I live in Wood, about midway between Queen and Prince streets. Had not been on the bridge the day before the dam broke. There was a great body of water came down the creek, I don't remember the exact time of tide when I saw it; all overflowed. Part of the dam broke when I was there; came with great force. There had been heavy rains. I reckon it took nearly all that day, or more, for the water from the meadows to be discharged. I can see the meadows daily. See them from my windows.

John Sexton, called again by the defendants. "I put some sluices in that creek about four or five feet above the arch of the bridge on the upper side, in 1806. Charles West, old Mr. Ball, and Mr. Norris, managers at that time. The meadows above all under water. Below, the course of the creek seemed to run very close to the side of a building on the north side of the creek, the first building below the bridge, and I thought would wash it away if something was not done. After it was stopped sometime, observed rubbish thrown out. Noticed that the creek took a pretty straight course out from the bridge, at that time it appeared to take a straight course to low-water mark. Did not see any rock.

William Hough, sworn.—" Am employed by Dr. Dyott at the glass works. It will be eight years the 8th of next May. At the time of the freshet, the water was annoying us a good deal in the glass-house yard. It was above the wharf. I had occasion to go across the yard, to that side close to the creek. I observed that the dam above was bursted. It was pretty early in the morning, 7 or 8 o'clock. Saw a great deal of stuff, lumber, some boards and pine wood coming down. I observed that instead of going its usual course down the creek, it made its way across the flats; and seeing the water going a contrary course to what I had seen before, I began to look a little to see the reason of it. I saw, that not quite half way below the piles, from there to the bridge, there were some arks laying across the creek. I had seen some before, very frequently; they were arks loaded with coal. Before I had seen them frequently, but this time I observed particularly, that they did not rise at high water. I saw the water striking in a strong torrent against these arks, and then flowing across the flats. I thought it then my business, as soon as the water fell, to see the reason why

(Ball *v.* Slack.)

the arks did not rise.   When the water fell and tide was down, that evening or next morning, I walked down the flats, and believe it was fifteen or twenty yards below the piles; there was a body of stone put in the midst of the creek: not common building stones; flat stones rather of a sandy nature; free from mortar, or any corrosive substance, flat, 12 to 18 inches broad.   About as many as a coal ark would hold.   Good part of them there to this day.   On this bed of stone, lay together two coal arks, connected together with a little pin: lay in a horizontal direction, dipping towards the creek, and they held both water and coal.   From the edge of these two arks, lay five or six arks more, all in one line—one completely on Dr. Dyott's flats, and one or two on the opposite side of the creek. And close adjoining to these arks, a large plank, about two and a half or three inch plank, about twenty feet, which had come down, that dashed up and formed a complete dam; the water struck against this, and the plank turned it over on to the Dr.'s flats; with the force of the current, and wood floating, it knocked off some dirt about ten or twelve feet, and gullied more than a foot deep.   The bottom all round hard and solid, with a great many hard roots— dock.   Walked down round the point; saw an old quarter of a dollar.   Returning back, there is a sort of elbow, or turn in the creek, the surface of a large rock inclining northwest, about six or seven feet from the elbow—may be eight.   In the centre of the rock, a small hole about ten or twelve or fourteen inches square.   The whole surface of the rock appeared not less than twelve or fourteen feet square.   Have since been on the rock several times.   It lays, about an inch more or less, four feet above the bottom of the creek. Not less than four feet.   The broken pots are a very valuable article.   I believe that not a piece as large as my hand is put in the river.   I believe no man ever saw it; I never did.   The height of the old wharf above the flats, composed of three logs one upon another, all of which are worn away; the bottom one remains with the iron.   When we have taken cinders, &c. we have laid them there, and notwithstanding, there have been left from four to six feet within four or five years.   I mean the side wharf next the Coal company.   All on the Delaware side is a new wharf.   We have looked at the rock.   I believe it was in the last spring, probably May or June, the last time we looked at it.   The logs are washed away, by being rotten.   What I call the old wharf is as it now stands on that side; there is no other.   The water at high tide runs higher than the former height of the logs; difference in tides, some not so high, some higher.   The four to six feet have been taken away, in a strait line from the first glass-house down to the second, in some places, four feet, in some as much as six, and in some places, we have laid mud on to keep it from washing away.   At the southeast corner of this old wall: this was done from two to four weeks ago.   The cinders and rubbish is thrown out at the glass-

(Ball *v.* Slack.)

house door, and when the tide comes it washes away. More washed away when the cinders are thrown at least six feet. From the upper glass-house to the bridge, there are logs, and I believe there was a fence. I believe that the logs remain as they were. I believe neither gain or loss. There is an old log that covers; through this is a kind of conductor. That log comes between the second and third log—opens and there is a piece of leather. I saw it in 1825, and it had then nothing gained or lost. This log conducted the water out of the creek, into a kind of basin or reservoir, made to receive the tide water. The logs are all pretty much as they were; some part washed away. At a common high tide, the water will go over these logs. The bottom is bare there close up to the logs, at low water; not more than a few inches. The bottom is always bare the whole extent; one part six or seven feet, in some places rather more. I think it may be ten feet against the wall; the end next the bridge. I cannot say whether gain or loss, at the place where the pipe is—may be a little gain; lower down, loss. The ground may have gotten a little higher, right up against the upper glass-house. The cinders and rubbish are thrown out below there, and washed away. There may be some broken glass in it, a little. About the general quantity that there is in coal arks, in those I have spoken of. I cannot say at what time in the night the dam broke, but when I got up the next day I saw it. Saw the arks there the day before; had been there two or three days. They remained six to eight days, during which time I saw the fishermen haul their boats over—sometimes on the Dr.'s flats."

Michael Dyott, sworn.—"I saw the arks: in May or June, the fresh. The water came down with tremendous force. Saw two lines of arks, lying across the creek. Saw the plank. Several large logs drove down against them. The water came with a tremendous force and was forced over the flats, and took away a prodigious quantity of soil. Have been there a little more than three years. Broken pots are not thrown away; we work them over again; they are of too great value. Every broken pot is worth four dollars. The ground has washed away as much as five or six feet between the two glass-houses. Had mud put on the point."

Benjamin Moore, called again by defendant.—"At the same time that I took the course before, I took the course of the creek from the bridge to the bar, and it was south two degrees west. The distance from the bridge to the north side of the pier is 520 feet. The first course of the creek from the pier upwards is north thirty-five degrees east, as near as I could direct the sight. The course above the bridge, about the same range as below the bridge. From the station I took to the head of the pier, is south fourteen degrees west. Where the creek runs under."

(Ball *v.* Slack.).

In the course of the trial, the defendants offered in evidence an old draught, purporting to have been made by Lewis Evans, before the revolution, showing the course and situation of the creek, and the boundary of the adjoining land; the following testimony having been given in relation to it. The admission of this draught was objected to on the part of the plaintiff, but it was received by the judge, who at the same time expressed great doubt as to the propriety of admitting it.

Benjamin Moore, affirmed.—" I am professionally a surveyor; live in Green street, Northern Liberties; one of the regulators of the Kensington District. 'I am well acquainted with this plan, Lewis Evans'. We use it frequently in the surveys we make in the District. The District, incorporated, extends from Hanover street to Norris's line, beyond Gunner's creek."

Joseph P. Norris, affirmed.—" Lewis Evans was a surveyor here formerly. I believe he made a map of the middle colonies. I suppose he resided in Philadelphia. I have had in my possession surveys made by him. I do not recollect whether I have now or no. That I alluded to was part of the township of Norriston, which I gave up to my brother. I have seen his hand-writing. This signature is very much like his writing on the draft that I mentioned. I presume he is dead. I believe he died in prison in New York. The owners of the ground along Gunner's run, are sometimes assessed. Never knew this draft referred to. We had one made in 1770; I delivered it up about a year ago to John C. Browne. I mean the owners of the ground above. Browne was an owner above, and his father before him. William Ball was treasurer of the Gunner's Run company. I was for a time; and John C. Browne. He lived in Kensington. I have the papers, a number of them, of the late Isaac Norris. This is a paper, copy of an original in my possession. I had no personal acquaintance with Lewis Evans. I imagine he died before I was born. I imagine about 1760 or 1765."

Ephraim Haines, affirmed.—" I believe that this is the same paper, that I received from John C. Browne, subsequent to this controversy, and took to the office. I think very soon after the suit commenced."

Joseph Watson, affirmed.—" This book being in the possession of the Lehigh company, I returned it to Mr. Browne, and again asked for it and received it, and placed it in the hands of Mr. Scott. I am president of the company."

Benjamin Moore, called again.—" The regulation of part of the District has not been made. It is now going on. The other surveyor is taking another part. When he and I are together, we have referred to this survey, as the best document that we can refer

(Ball *v.* Slack.)

to; and I know of none that we can refer to for that time, better than that. When I was appointed regulator of the district, John C. Browne was president of the corporation. He told me that he had a plan. George F. Kremmell's plan adopted by the court. It appears to be nearly a copy of it. I do not know of any public act of the corporation adopting this plan. John C. Browne lent me this plan to take a copy of it. I made a copy of it. I was appointed by the commissioners."

At the close of this evidence, the following agreement was entered into by the counsel :

" That the verdict of the jury shall be given for the defendants; under the charge of the court that the title of the plaintiffs commences·at high water mark, on the fast-land, without prejudice to the rights of either party, or inference from the finding of a jury. The court to have the power on the judge's report of the evidence, to decide any question of fact or to order a new trial: and all other questions of law to be considered as reserved."

The case was argued by Mr. *C. Ingersoll* and Mr. *J. R. Ingersoll,* for the plaintiffs, and Mr. *Scott* and Mr. *Sergeant,* for the defendants.

For the plaintiffs were cited, *Blundell* v. *Cathrall,* (5 *Barn. & Ald.* 268: S. C. 7 *Eng. Com. Law Rep.* 91.) *Freytag* v. *Powel,* (1 *Wharton's Rep.* 536.) *Uberoth* v. *Lehigh Co.* (7 *Hazard's Register,* 293.) *Cooper* v. *Smith,* (9 *Serg. & Rawle,* 32.) *Chambers* v. *Fury,* (1 *Yeates,* 169.) Act of 29th March 1803; *King* v. *Grosvener,* (2 *Starkie,* 511: S. C. 3 *Eng. Com. Law Rep.* 453.) *Respublica* v. *Caldwell,* (1 *Dall.* 150.) *Hart* v. *Hill,* (1 *Wharton's Rep.* 130, 137.) *Commonwealth* v. *Shaw,* (14 *Serg. & Rawle,* 13.) *Gifford* v. *Yarborough,* (15 *Eng. Com. Law Rep.* 403.) *King* v. *Yarborough,* (10 *Eng. Com. Law Rep.* 19.) *Peyton* v. *Smith,* (5 *Peters' Rep.* 487.) 6 *Cowen,* 547, note, citing *Hammond* v. *M'Laughlin,* (*Taylor's Rep.* 196.) *Barclay* v. *Howell,* (6 *Peters' Rep.* 512.) *Lunt* v. *Holland,* (14 *Mass. Rep.* 149.) *Barber* v. *Bates,* (13 *Picker.* 261.) *Adams* v. *Frothingham,* (3 *Mass. Rep.* 360.) *Jacobsen's Sea Laws,* 417-18. *The Gebroeders,* (3 *Rob.* 342.)· 5 *Rob.* 343. *Conn* v. *Penn,* (4 *W. C. C. Rep.* 431.) Charter of Bristol in 1720, (Appendix to 1 *Dallas's Laws.)· Handly's Lessee* v. *Anthony,* (5 *Wheat.* 374.) *East Haven* v. *Hemimgway,* (7 *Conn. Rep.* 202.) *Peck* v. *Logwood,* (5 *Day,* 222.)·

For the *defendants* were cited, Act of 1818. *Comyn's Dig.* tit. *Grant,* G. 12. *Penn* v. *Kline,* (1 *Peters' C. C. Rep.* 298, note.) *Sir Matthew Hale de Jure Maris,* (in *Hargrave's Law Tracts* and 6 *Cowen,* 537.) *Commonwealth* v. *Charlestown,* (1 *Picker.* 182.) 3 *Kent's Com.* 344. *Carson* v. *Blaser,* (2 *Binn.* 475.) *Shrunk* v. *Schuylkill Nav. Co.* (14 *Serg. & Rawle,* 78.) *Commonwealth* v. *Shaw,* (14 *Serg. & Rawle,* 1.) *Commonwealth* v. *Fisher,* (1 *Penn. Rep.* 467.)

(Ball *v.* Slack.)

The opinion of the Court was delivered by

HUSTON, J.—This was an action of trespass; and the cause turned on the construction of the grant, or grants, under which the plaintiffs claimed; for if the right to the *locus in quo* was in the plaintiffs, the defendants were wrong-doers.

At the opening of the case I was disappointed, in that a more careful search for original papers had not been made in the land office, and for the deed from Gunner Rambo to Major George Lillington, and other deeds from that time down. Those papers might, and I still suppose, would have put at rest all the disputed facts in this cause.

We must however decide on what is before us; and when the cause comes again before a court, if there is other evidence, they must decide on that. The last part of my remark will not be disputed; but long experience has taught me that where a new trial is granted by this court, the cause goes back with a heavy weight in one of the scales, and it is always asserted, and sometimes believed, that a different result cannot be given to the cause, without disrespect to this court: whereas in truth every original title may, by long use, by long neglect, by long intrusion of others, or by many other matters, be limited or extended, especially where the boundaries are in any degree vague; and in all new trials it is possible, there may be a different finding of the facts, and different evidence from that at first adduced.

The original grant under which the plaintiffs claim, as exhibited to us, in what I suppose to be what is since called a warrant of acceptance, is in these words: "The first piece of land beginneth at the mouth of Gunner's Creek; from thence running up the several courses of Delaware river to a corner post of Peter Nelson's land; then N. 16° W. by said Nelson's land, 110 perches to a corner white oak standing near unto the above said Gunner's Creek; from thence following down the several water courses thereof to the place of beginning; being fifty-four acres of *land, swamp, and cripple.*" The grant is to Gunner Rambo, old renter. I need not recite the course, &c. of the other parcels granted; the one of them is of swamp, meadow and cripple, between Nelson's fast-land and the Delaware. This land granted to Rambo, and other adjoining land had become the property of Anthony Palmer, who, on the 21st of March 1728, granted to the ancestor of the plaintiffs six hundred and seventy-six acres, beside the flats thereto belonging: the description is, "Beginning at the mouth of Gunner's Creek and running up said creek on the several courses thereof 291 perches to a line of Robert Rawle's land;" it then gives the courses and distances, and corners and names of those on whom it bounds till it strikes another creek; "thence down the same 247 perches to the river Delaware; thence down the said river 572 perches to the beginning."

(Ball *v.* Slack.)

The proof is, that the tide went up Gunner's run a mile or more; and on the 24th of February 1770, an act of assembly was passed, authorizing the owners to protect the low lands on this creek from being overflowed, by a dyke or bank, and a sluice or sluices in it.

If there is any point settled in Pennsylvania relating to land titles, it is that where a grant or survey is bounded on a river or creek, it extends to that river or creek, and except in the case of large navigable streams, extends to the middle of the creek; and whatever may have been or may be imagined in this vicinity, I think that where a man's grant or his survey calls for a creek or river, no lawyer of any reputation would contend that another could come between him and the creek or river, and cut him off from it; and where the courses and distances on the creek or river are given, and on examination it is found, they do not closely follow the stream, it does not alter the case. A surveyor cannot run a curve line with his compass; and courses and distances may have been taken incorrectly, or an error may have been made in making out the return of survey; but if a creek is returned as the line, there can be no mistake as to it; it is the line; and courses and distances along it are disregarded.

I do not understand that in this case these principles have been denied or controverted. The contest is not whether the plaintiffs' right extended to Gunner's run; but where Gunner's run or the mouth of Gunner's run is; and this again is subdivided.

I shall not examine the doctrines and cases of construction of grants, for the cardinal one supersedes inquiry as to the rest. I mean that every grant is to be construed according to the intention of the parties. The grant is to begin at the mouth of Gunner's run and to extend up it by its several courses: there is no ambiguity in this; if there had been, universal usage and uniform decision have affixed the meaning.

The mouth of Gunner's Creek must mean the place where it discharges its waters into the Delaware; if it meant the point beyond which the tide did not stop its current, or swell beyond its bank, then the mouth was a mile from the spot in dispute; which is not pretended. But it is contended that this grant means, ' beginning at high water mark above the mouth of Gunner's run;' but this would be a different grant, and as high water mark for a mile up the creek was different from the channel of the creek at low water, this construction would cut Rambo from this creek: he would touch it no where; and besides what meaning must we give to the words, fifty-four acres of land, *swamp* and *cripple*.

It is contended, that flats are different from swamp and cripple; it may be so; since this grant, however, we have proof that more than one range of timber and board-raft have laid at high tide and low tide on what are now called flats; and a hundred small craft have been passing over these flats daily; and it is possible that vege-

(Ball *v.* Slack.)

tation extended at one time much nearer the low water mark of the river and creek than it now does. I shall suppose, however, that in this respect, the appearance was always what it now is.

We then come to the question, what right has the owner of land adjoining and bounded by the Delaware or Schuylkill, to the ground over which the tide runs every day, and which is left free from water every day. This, if it is still a question, is an important question. The general proposition, that the owner has a right, restricted by the fact, that the river is a highway, does not seem to be denied; for the defendant showed a deed for the flats between his fast land and low water, and claims to low water by that deed, and puts his right to go beyond low water, on the permission of the wardens.

It seems to me, that writers and courts from Sir Matthew Hale to this time, agree on this subject; different cases have brought the question in different shapes before courts. It seems agreed, that between low water and ordinary high water of the ocean, and wherever the tide ebbs and flows, is part of the common highway, over which all citizens and aliens may sail. In England, this is said to be vested in the king; here it is in the state. There and here, originally, goods might be landed any where, on permission from the owner of the adjacent land; now in both countries, on account of revenue, ports of entry are established, at which alone certain goods can be legally landed, except in case of storm or distress.

There and here the government have exercised the right of building wharves, &c., for the improvement and convenience of trade, on the intermediate space between high and low tide, and beyond low tide; but I know of no instance, either in that country or this, where it has been held that one man can, of his own right, or by the permission of any officer of government, build a wharf on the property of his neighbour. I do not say any thing of acts of the legislature, for the improvement of a city or port, where, if the owner refuses, certain persons may erect for him, and charge him with the expense; such or similar laws have been; I am not speaking of such cases.

Our acts of assembly would seem to have recognised the right of the owner to erect wharves down to low water mark. The act of the 7th of February, 1818, is supposed to have limited this, and to have required the sanction of the wardens even for this. I do not consider it necessary to discuss this point; at all events, the person applying, must show a right to the place to the wardens; but their permission is not evidence that he has a valid right; they have no power to cite parties or try titles; but it shows that none could lawfully build a wharf, but he who had a right to the place where it is built.

We come back to the question, was the land where this wharf is erected, the property of the plaintiff? A good deal was said about the right of fishing being limited to a right-angle line from the shore.

(Ball *v.* Slack.)

The act of 1809, section 10, provides, "That if any person or persons whatever shall cast or lay out any seine or net into the river Delaware, within the jurisdiction of this state, beyond the right angle of the shore, and where *his line strikes the river at low water mark*, in going out, or suffer it to swing beyond the right angle of the shore of the river, and where his line strikes it at the water mark coming in," &c. The act of 1785, in the sixth section says, " where two live adjoining each other on the same side, each shall have the right of fishing opposite his own land ; the position of which pool is to be by continuing the course of the division line or lines of the persons next adjacent." This act relates to the Schuylkill. There is nothing in these acts in favour of the defendants ; and they show the understanding of the legislature, that the owner of the fast land had a right between high and low water mark; the extent of which on the river, was to be ascertained by continuing the lines of his land which came to the bank of the fast land. The line of the plaintiff is Gunner's creek. Gunner's creek is where the water of that creek flows, when the tide permits it to flow ; and the mouth of Gunner's creek is where it flows into the Delaware, when the tide permits it to flow ; and is the same at high water as at low water.

As to the possession of the plaintiff: possession of the inclosed land is possession of the flats. That rafts and boats at high water, passed over the flats, amounts to nothing. The right of the plaintiff was subject to this right in the public at high water ; but this right of the public to sail over the flats in high water, is totally different from the right of an individual to erect a wharf, and keep possession, for his own emolument, at all states of water.

There were two papers offered ; one was what was called Lewis Evans' plot of the Palmer estate, on the opposite side of Gunner's creek. I do not say that in no case can a draft of adjoining lands, though not in the land-office, be given in evidence in a contest about the extent and boundary of adjoining land. This purports to be a solemn partition of land by heirs, accompanied by a draft ; but it does not extend, as an act of the parties, to Gunner's creek ; the south-west side of Gunner's creek from the road, and for some distance down the road, was not included in the partition then made ; it is stated to be the property of Dr. Shippen, in fee. The surveyor ascertained the lines of it, where it adjoined the lands of Palmer's heirs ; though his doing so would not bind Dr. Shippen ; much less can the courses and situation of the creek and river, at a distance from the Palmer estate, affect the plaintiff. There is no presumption that the creek and river were laid down from actual survey. His duty did not require him to survey them. And if it had been observed that the land south-west of the creek had not been the subject of partition, and that no courses and distances were set down

along that part of the creek or the river, I think it would not have been admitted.

The paper in the handwriting of John Lukens, was also admitted. It is thus, "16th March, 1773, being called upon to go in company with Hugh Roberts, Joseph Fox and Charles West, to the bridge over Gunner's run or creek, on the read to Point-no-Point, and after placing a surveying instrument over where *they said* the middle of the creek formerly was, *they set* the course to the place *they said* the creek's mouth at *low-water mark was.* The same was found to be S. 7°. E. from the same station the chimney of Marmaduke Cooper's new house bears, S. 15° E. and the steeple of Christ Church bears S. 43° 45' west. Carefully examined," &c. The acts, and in some cases the declarations of a surveyor when executing a warrant, are evidence: but after a survey has been executed and returned, neither his acts nor declarations can affect the right of the owner. But the objection to this paper is, in addition to what I have said, that we don't know the gentlemen named; we don't know, and nothing in this case raises even a presumption, that either of them had any interest in the lands, even near this spot. The mouth of the creek is taken from their information; John Lukens don't pretend that he saw it. Now it will not do that a title shall depend on the parol declarations and unofficial acts of any men, however respectable they may have been. The law for embanking out the tide had passed in 1770, and it is probable they met to settle something, or some right up the creek.

The case of *Blundell* v. *Cotterill*, decides that although the king or the public may sail over land covered by the tide when up, yet the owner of the adjacent fast land can support trespass against one entering on and exercising acts of ownership, at low-water. And it must be so: if wharves can be erected between a man and the river, why not houses? and if he has no remedy, a stranger or strangers may come between him and the river and make his farm what is called a dry land farm; he may have no place at which to water his cattle. We are then of opinion the plaintiff has a right to the run and to half of the run: if the boundary of the run on his side, is flats covered with water, at high tide, still he has such right to and interest as that no person can come between him and the run or erect a wharf or any thing else on the plaintiff's side of the run; and that this right extends to the river at low-water mark, and to the mouth of the creek at low-water mark.

There is some contrariety in the testimony as to where the mouth of the run was, and where it is: if it is different from what it was, if this change has been gradual, and arising from the creek and river solely, the alteration is the gain or loss of the different owners on different sides; but if it has been occasioned by the acts of the parties, the act of one party shall not injure the other. We hear of a dam on the creek breaking, of the channel of the creek having at

(Ball *v.* Slack.)

that time been obstructed by loaded arks lying in it or sunk in it, and that this forced the current across the plaintiff's flats and wore a channel above the former mouth of the creek; if this were so, it will not alter the right of the plaintiff; we are told the wharf is built so as to obstruct half the channel of Gunner's creek, and that above the wharf material was taken to fill the wharf, and that thus part of the present outlet of the creek is above and part below the wharf; if this be so, and the change was the consequence of acts done by the defendants, this will not alter the right, nor give to one or take from the other. With these observations we leave it: if the defendants please they may have a new trial as to where the mouth of Gunner's creek was and is, and if there is any change, how it was produced.