## Kreiter *versus* Bigler.

1. When a survey calls for a road as a boundary, without other description of the line, it must be taken to include all the land to the middle of the road.

2. A. and B. were owners of adjoining lots of irregular shape fronting on a turnpike running diagonal to a cross street which was another boundary of A.'s lot. In order to make his side lines parallel, A. purchased from B. an irregular strip of land and established new parallel division lines. While the lines were thus established B. conveyed to C., and afterwards the turnpike was vacated and a public street was laid out on a course diagonal to that of the old turnpike. C. then conveyed to D. and A. conveyed to E. In a contest between D. and E. as to the ownership of the ground formed by the vacation of the turnpike,—*Held* (reversing the

[Kreiter *v.* Bigler.]

judgment of the court below), that the boundary lines between the adjoining owners should be projections of the old party lines, which were at right angles with the abandoned turnpike, and not continuations of the new division lines, which were at right angles with the new street.

3. The rule, as stated in Wood *v.* Appal, 13 P. F. Smith 210, that to start from the bank of a river on a line perpendicular to the stream is the proper method of determining the river frontage, must be taken with reference exclusively to the facts of that case.

4. *Semble,* that the owner of land on the bank of a navigable stream is entitled to claim to low-water mark by lines running directly from his extreme bank marks, if any such he has, to the beach, and this without regard to the courses of the side lines of his survey. This rule will not, however, be applied in all cases.

5. Whether the rules above laid down with regard to lots facing on navigable streams apply in the case of a vacated road, *dubitatur.*

May 30th 1882. Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey, Sterrett and Green, JJ.

Error to the Court of Common Pleas of *Dauphin county:* of May Term 1882, No. 66.

This was a case stated in the nature of an action of ejectment, between Sarah F. L. Bigler, plaintiff, and J. Monroe Kreiter, defendant, as follows, viz. :

In September 1826, the administrators of William Maclay sold to Henry Antes three tracts of land, bounded on two sides by the Millerstown turnpike and by Eckert's lane (now Herr street); these tracts contained respectively three acres, two acres, and two acres; and the dividing lines between the tracts were parallel with the said lane or Herr street.

In February 1840, Henry Antes conveyed the said three tracts to John Forster, who laid out thereon certain lots, among which were Nos. 148, 149, 150 and 151, as shown on the annexed draft (by the dotted lines).

In April 1860, John Forster and wife conveyed to Charlotte L. Safford lots 150 and 151, on the corner of Herr street and the turnpike. The said turnpike did not make a right angle with Herr street; so that a portion of the easterly line of lot 150, while at right angles with the turnpike, was not parallel with Herr street.

In October 1862, the said lots were conveyed by Charlotte L. Safford to Prudence Smith, who in the same year devised them to A. C. Smith.

In November 1862, the title to lots 148 and 149 became vested in John W. Ewing.

In August 1865, the executors of John Forster laid out lots 30, 31, 32 and 33 on the annexed plan, extending from the easterly line of lot 148 to Boas street.

[Kreiter *v.* Bigler.]

In November 1865, and November 1866, J. M. Wiestling acquired title to lots 30, 31, 32, 33, 148 and 149; so that the owners of the entire plot between Herr and Boas streets were A. C. Smith and J. M. Wiestling.

In February 1867, Mr. Smith purchased from Mr. Wiestling a piece of ground contiguous to his property, of such a shape that the eastern line of his united properties became parallel with Herr street. J. M. Wiestling established new division lines, all of which are parallel with Herr street (shown by the solid lines in the plan).

In May 1867, Malvina Ingram purchased from J. M. Wiestling a lot adjoining A. C. Smith, the westerly line of which, from the edge of the turnpike to the rear of the lots, was identical with the east line of the lot of A. C. Smith, and both lines of which said lot of Mrs. Ingram were parallel with Herr street.

Subsequently, in 1871, the said turnpike was vacated.

In 1881, the plaintiff purchased Mrs. Ingram's said lot, and the defendant purchased from A. C. Smith the lot composed of the united properties derived by A. C. Smith from Prudence Smith and J. M. Wiestling.

By reason of the vacation of the turnpike both lots are entitled to certain land between their respective fronts and the centre line of the turnpike, and this controversy arises concerning the ownership of a certain triangle of land lying immediately in front of the plaintiff's lot, and described as follows, &c. (being lot marked **A** in the plan):

The deeds and plans herein referred to are made part of this case stated.

If the court shall be of opinion that in deciding what portion of the vacated turnpike each lot is entitled to take, the line which decides the rights of the plaintiff and defendant is the party line parallel with Herr street, as it existed in 1867, after the purchase by A. C. Smith from J. M. Wiestling, and also when the turnpike was vacated, then judgment is to be entered for the plaintiff for the triangle above described. But if the court shall be of opinion that the line which governs is the eastern line of the lot No. 150, as conveyed to Charlotte L. Safford, and that the defendant has a right to continue that line to the centre of the vacated turnpike, then judgment to be entered for the defendant.

The following is the plan referred to in the case stated, the triangle of land, the ownership of which was in dispute, being designated as **A** therein.

[Kreiter *v.* Bigler.]

The court entered judgment on the case stated for the plaintiff, Pearson, P. J., filing the following opinion:

"This case as stated sets forth the points of the case with clearness. It discloses substantially that General John Forster many years since became the owner of a larger piece of land of which the locus in quo was a part. A turnpike was made through or alongside of the premises, not at right angles with the lines of the land, but sloping across from the termination of a street towards the river, as shown on the draft annexed to the stated case.

"General Forster laid out a number of lots on the piece of land, intended as building lots, not by straight lines, but the lots all starting on a straight line; but when run about one-half the length, the line deflected to the one side, so as to make the fronts on a straight line with the turnpike. Three of these lots,

5 OUTERBRIDGE—8

[Kreiter *v.* Bigler.]

embracing the land in controversy—probably others also—which deviated from a right line in order to make a full square front with the turnpike, went through numerous hands, the deeds all calling for the turnpike as a boundary. Sometime about the year 1871, this turnpike road was vacated and abandoned, and we have no doubt that from well-settled principles of law one-half of the land embraced within its bounds—that is, to the centre of the road—became the property of the adjoining lot-owners; that is, that each owned, and from the time of their purchase had owned to the centre of the road, subject to the public right of way. The question is, how are the lines to be run from the termination of the former survey, so as to give each owner his proper share of the new acquisition? This makes a difference of a little over eight feet from the point at which both lots start, which is at the same point to the thread of the centre of the road, twenty-five feet distant; that is, the half width of the road. It would be a very small piece of land to lead to a controversy in a farm; but is not quite so insignificant in the front of a city lot. Mr. Kreiter's lot was purchased at different times, but his second purchase terminated at the line of the first, on the edge of the road, did not add anything to his width. The plaintiff contends that her line should run directly across the land obtained by the vacation of the road; the defendant, that his should extend across at the right angle at which his line was running when it struck the margin of the road, which would give him the land in dispute. This is a question perhaps not settled by judicial decisions in Pennsylvania, or, so far as we have examined not decided elsewhere.

"It is contended by the defendant's counsel that the case of Wood *v.* Appal, 13 P. F. Smith 210, establishes the law in his favor. We are disposed to think that it operates strongly against him. That was the case of a survey on a large navigable river—the Ohio. The corner was placed on the bank; was reached by a line running at an oblique course with the river. This was on the high bank; the parties both claimed to run to low-water mark. The one, by the course of the oblique line by protracting it until it struck the water; the other, by a line running to low-water mark at right angles from the landmarks on the top of the bank. The court below decided that such was the proper principle. To continue the line by protraction at the course it was running when it struck the bank would cut the plaintiffs off almost entirely, and give defendant nearly the entire front; by running at right angles from the corner part on the high bank would give each the same width at low-water mark which they had on the bank above, to which Judge HAMPTON said they were entitled. This was affirmed in the Supreme Court in an elaborate opinion, not easy to clearly

understand; but it affirmed the principles enumerated by the lower court. Ever since the case of Carson v. Blazer, in 2 Binney 475, the right to extend the surveys on navigable rivers to low water mark has never been doubted in this state, and it is equally well settled that when a road is called for as a boundary the line extends to the middle of the road. The owner of the land holds to the middle of the road for every purpose except the public right of passage. If a vendor owns to the road, his conveyance passes the land to the middle of the road, unless that is withheld by very clear expressions: Paul v. Carver, 12 Harris 207; also reported in 2 Casey 223. So of a street in a city or borough, although the side of the street is called for as the boundary: Cox v. Freedley, 9 Casey 124. A host of authorities might be cited to the same effect, both as to roads and water-courses. We find the doctrine sustained as to reaching low-water line by a direct line from the corner of the bank, in 2 Cushing 199, Knight v. Wilder. The line is not to be protracted on the course it was running on the top of the bank at the corner, but by a direct line at right angles to low-water mark. This corresponds with our case of Wood v. Appal, already cited from 13 Smith. There is another principle urged by the defendant's counsel—that in running the lines across the road from the corners of the lots, you must strike the opposite side at the nearest point at which it can be reached from the corner, which would from the slope of the road cause it to be struck in the direction of his line as running when it reached his corner. This would give him the land as claimed. We can find no such principle laid down in any work of authority, or any reported case. All say that you must run the line at right angles from the corner. Possibly it might be a foot less in distance to protract the line in the course it was running at the corner; but that would conflict with the other principle stated of running at right angles from the corner, and in some cases, both as to water-courses in reaching low-water mark and crossing abandoned roads, might do great injustice, by cutting off the front of the adjoining property, and not give the owner the same width of front he had before. For these reasons we consider the plaintiff is entitled to judgment on the case stated, which is rendered accordingly."

The defendant then took this writ assigning for error the judgment of the court upon the case stated.

*J. C. McAlarney*, for the plaintiff in error.—In the case of riparian owners, SHAW, C. J., in Knight v. Wilder, 2 Cushing 209, held that the general rule must be "to take lines at right angles with the course of the stream to its thread or middle line." So in Sparhawk v. Bullard, 1 Metcalf 106, WILDE, J., ruled that

the method governing the division of flats was to draw a
straight line according to the general course of the shore at high
water, and from this line to extend the side lines of the several
lots in a direction at right angles with the shore line ; and in
Wood *v.* Appal, 13 P. F. Smith 210, it was held, that, starting
from the bank, a direct course to the stream, or at right angles
to the stream, must always afford the shortest and most certain
boundary of river frontage.

While it is true that these cases involve the right of riparian
owners, the court below held the same rule to apply to the vaca-
tion of roads, and yet refuse to apply it in this case, saying, in
their opinion, that " you must run the line at right angles from
the corner."

*Lyman D. Gilbert,* for the defendant in error.—In 1866,
Wiestling and Smith were the owners of the entire plot of
ground between Herr and Boas streets. In order to make his
eastward line parallel with Herr street, Smith bought of
Wiestling an irregular strip of land, part of No. 149. By this the
lines of all the lots were made parallel with Herr street,
and the irregular line which once marked the eastern end of
No. 150 was destroyed as a boundary line. The line of Front
street having been substituted for that of the turnpike,
Kreiter's frontage is determined by a continuation of his present
eastern boundary,

The theory of the plaintiff in error is founded on the assump-
tion of an entire abandonment of the old road. As appears
from the plan, the abandonment is only partial. The vacation of
this street being only partial, Kreiter must take such portion of
it as the city has forsaken ; and if, in course of time, there should
be a further vacating, his land will receive a new enlargement.
If it be said that Mr. Kreiter, by this process, loses three feet of
frontage, we reply that he cannot correct it by taking, as he
desires to do, eight feet of land from Mrs. Bigler ; or if she,
in turn, can take a similar quantity from some one else, then
the loss must finally fall on the owner of the property at the
corner of Boas and Front streets. If such result could follow
the surrender by the public of its right to an entire street, it
certainly could not have this effect when only part of it is re-
turned to private ownership.

Mr. Justice GORDON delivered the opinion of the court,
October 2d 1882.

It is an undoubted rule of law that where a survey
calls for a river, or other navigable stream of water, even
though the marks of the surveyor are found along its banks,
nevertheless, in the absence of other controlling circumstances,
it shall be considered as extending to low-water mark. In

[Kreiter *v.* Bigler.]

like manner, where the call is for a road, without other descrip-
tion of the line, the survey must be taken to include all the land
to the middle of the road.

But it will not do to interpret the case of Wood *v.* Appal,
13 P. F. S. 210, as the plaintiff would have us interpret it.

It is true that it is there stated, in general terms, that to
start from the bank on a line perpendicular to, or at right an-
gles with, the stream is the proper method of determining the
river frontage; but we must take this statement as made with
reference exclusively to the character of the survey then before
the learned justice who delivered the opinion of the court in
that case. The projection of the side lines of that survey
would have run it nearly, or altogether, to an apex before
reaching the low-water line; hence, it was argued, the surveyor,
by fixing his marks on the bank, indicated what he intended
for the river frontage; and, as a consequence, the front, thus
indicated, must be extended directly to low-water mark. But
it is obvious that the rule, as above stated, applies only where
the lines of the survey either converge or diverge; for where
they are parallel a simple extension of them from the bank to
the water would, under ordinary circumstances, secure the
proper frontage. And such would seem to be the interpetation
given, in Ball *v.* Slack, 2 Wh. 508, to the act of 1809, regulat-
ing riparian rights on the Delaware river.

We think the better statement of the rule to be, that the
owner of land on the bank of a navigable stream is entitled to
claim to low-water mark, by lines running directly from his
extreme bank marks, if any such he has, to the beach, and this
without regard to the courses of the side lines of his survey.
It is obvious, however, that even this rule cannot be applied to
all cases; and we must, after all, have regard to the circum-
stances of each particular case, rather than to any unbending
rule of law.

Now, had the present eastern line of the Kreiter lot, which
is parallel with Herr street, been the original line between J. M.
Wiestling and A. C. Smith, the vendors of the parties in suit,
under the rule above stated, the case would be a clear one for
the plaintiff; for, in that event, the lines of both lots being
parallel, a projection of them to the centre line of the abandoned
turnpike would give them exactly the same front on that line
as they had on the north border of that road. But such is not
the fact. The line between Smith and Wiestling, before the
time of Smith's purchase of the western part of the eastern
lot, was diagonal to the present Kreiter line, and perpendicular
to the turnpike. So also were all the lines of lots Nos. 148,
149, 150, and the eastern line of No. 151, the former owned by
Wiestling, and the latter by Smith; that is, they were parallel

[Kreiter *v.* Biglèr.]

to each other and perpendicular to the road.  Here, then, again, by a simple projection of these lines, we give to each lot its full front on the centre of the turnpike road.  And why shall not this projection prevail?  The judgment of the court violates all rules; it neither extends the lines directly to the required boundary, neither does it run them at right angles with the turnpike.  It is true that a contrary judgment will interfere with the plaintiff's front as it now exists; but this results from the act of her vendor, Wiestling, who, before her purchase, so altered the east line of lot No. 148 as to make it parallel with Herr street.  Weistling could alter the lines of his own land to suit himself, but that gave neither to him nor to his vendees any new rights as to the lines or land of his neighbor.  As the lines of lots Nos. 149 and 150 originally stood, the triangular strip in controversy was clearly within lot No. 150; but when Smith bought part of lot No. 149, he did not surrender any part of the land which he had previously owned; and if the land in dispute then belonged to lot No· 150, we cannot see why it should not yet belong to it.

    But again, it is very doubtful whether the rule, as stated in Wood *v.* Appal, applies at all to the case of a vacated road.  The reason for the rule as applicable to navigable streams, is obvious enough; it is, that the land-owner's front may be maintained upon a natural highway which, in the nature of things, exists always; but when a road is vacated, there is no front to maintain; there is but the reversion of bare land; hence, no reason obtains why the lines designed to embrace it should not be run with their original courses.  Perhaps it would be different were the road but partially vacated, so that the lots could still be made to front upon it by an extension of their lines; in such case the rule governing river fronts might possibly apply.  But such is not the case in hand; Front street has not been laid upon the old turnpike; it has not even the same general direction, but crosses the old road diagonally.  Besides this, the rights of the parties in suit were fixed long before Front street was thought of; hence, we must regard the vacation of the turnpike as total, and treat this case on that hypothesis.

    Under this view of the matter in controversy, nothing can be more certain than that the judgment of the court below was wrong.

    The judgment is now reversed, and it is ordered that judgment be entered on the case stated for the defendant, with costs.